UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CATHIE ALLISON, et al.,

       Plaintiffs,

                                   File No.  5:03-CV-156

v.

                                   HON. ROBERT HOLMES BELL

MICHIGAN STATE UNIVERSITY, et al.,

       Defendants.

_____/

## O P I N I O N

      This civil rights action arising out of the detention and decontamination of Michigan State University employees in response to a perceived toxic threat is before the Court on Defendants' motions for summary judgment.  For the reasons that follow the Court will grant the University Defendants' motion for summary judgment and will grant in part and deny in part the City of East Lansing's motion for summary judgment.  The motions for summary judgment filed by Randy Talifaro and the ELFD will be denied as moot in light of the fact that these parties have been dismissed with prejudice pursuant to the stipulation of the parties. (Docket # 86).

### I.

      In October 2001, Plaintiff Debbie Conlin was employed by the graduate school at Michigan State University ("MSU") and was working in Room 118 of Linton Hall. On October 11, 2001, she noticed of a misaddressed and suspicious-looking letter that had

appeared to have been previously opened and resealed with tape.  She left it on a credenza in Room 118.  The following day, October 12, 2001, she opened the letter and immediately began feeling a burning sensation in her throat.  She resealed the envelope and took it to Room 110 (Conlin Dep. at 9-20).  After conferring with Dean Karen Klomparens and other co-workers, Conlin called the MSU Department of Police and Public Safety ("DPPS") on its non-emergency line and advised East Lansing Dispatcher Heidi Williams that she had a burning sensation in her throat after opening a letter and that she did not require medical attention.  (Conlin Dep. at 21-26).  Conlin returned to Room 118.

When she made the dispatch call, Williams confused Conlin's call with a call she had received previously that day and erroneously advised that there was white powder in the envelope opened by Conlin.  Erroneous information was also communicated to the responding officers that the letter said "animal research will stop."  (Wyman Dep. at 17 & 21).

Conlin opened the letter on October 12, 2001, one month after the September 11, 2001, terrorist attack and during the wave of anthrax attacks across the nation. (Dunlap Aff. ¶ 3). During this period the MSU DPPS was receiving daily alerts from the FBI, law enforcement agencies were on "high alert," and the prospect of bioterrorist attacks was a matter of grave and immediate concern to law enforcement. (Dunlap Aff. ¶ 4).  The previous day East Lansing Fire Department ("ELFD") Deputy Chief Wyman had met with Bob Ceru of MSU Office of Radiation, chemical and Biological Safety ("ORCBS") and Lt. Wardwell

of the MSU DPPS to review the ELFD's Hazardous Materials Emergency Response Plan. Wyman then went over the plan with those on duty at the Fire Department. (Wyman Dep. at 9-13). Prior to this review, the department's last decontamination practice training was sometime after the plan was adopted in 1997. (Wyman Dep. at 13).

When DPPS Officer Putman received the dispatch call she spoke with Conlin by telephone and then proceeded to Linton Hall to begin an investigation. (Putman Dep. at 10-14). Conlin returned to Room 110 where she was interviewed by Putman. (Putman Dep. at 15-16). Putman quickly learned from Conlin that there was no white powder. She communicated this fact to MSU DPPS Lt. Mary Johnson. Johnson told Putman to lock Room 110 and not allow anyone to come in or to leave to avoid further contamination. (Johnson Dep. at 21; Conlin Dep. at 37-38). This rule was generally enforced, although the occupants of Room 110 were allowed to use the bathroom outside the door of Room 110, and Klomparens and Putman did step outside Room 110 at one point to converse with ORCBS Officer Parmer. (Conlin Dep. at 42).

Meanwhile, representatives of the MSU ORCBS, the ELFD, and the Federal Bureau of Investigation ("FBI") were congregating outside of Linton Hall to discuss how to proceed. (Wyman Dep. at 19-20). The representatives of the various agencies had different responsibilities. The focus of the MSU DPPS was to assess the crime scene and to retrieve potential evidence. (Johnson Dep. at 39-40). Deputy Chief Wyman of the ELFD was the incident commander for the decontamination procedure. (Ceru Dep. at 30-31; Johnson Dep.

at 92; Parmer Dep. at 9 & 12).  The role of the ORCBS was to evaluate and clean-up the hazardous site and to provide consultative information, equipment and monitors to the incident command.  (Parmer Dep. at 11-13).

After conferring with the representatives of the various agencies, Wyman determined that the threat was credible and that the nine people in Room 110 should undergo a biological decontamination procedure.  (Wyman Dep. at 23-24, 34).  Wyman established a command post and directed individual ELFD officers to conduct the decontamination procedure. (Wyman Dep. at 36-38).

In the meantime, the DPPS investigated the information it had regarding the sender of the letter.  The return address indicated that it was from SAEN, an acronym for "Stop Animal Exploitation NOW!," which is an animal rights protest group.  (Johnson Dep. at 19). Before the ELFD began the decontamination operation, the FBI advised the DPPS that the sender of the letter, Michael Budkie, was an animal rights activist, that he was highly critical of animal research conducted at public universities including MSU, that he was the subject of FBI surveillance, and that he was a self-employed chemist or pharmacist.  (Dunlap Aff. ¶ 8).  The FBI advised that there was reason for concern because Budkie would have access to chemicals.  (Johnson Dep. at 93 & 96).

The previous year the Earth Liberation Front ("ELF") acknowledged having burned-down part of Agriculture Hall, across the street from Linton Hall, to protest research in genetically modified crops.  In the 1990s an activist with the Animal Liberation Front

("ALF") plead guilty to arson at Anthony Hall, the release of minks and other property damage at the MSU Farms. (Johnson Dep. at 9, 94-96).

Sometime during the afternoon ELFD Lt. Mike Montgomery advised Dunlap that Sparrow Hospital would only take the detainees if they were decontaminated in advance. (Dunlap Aff. ¶ 9). DPPS Lt. Johnson concurred with the ELFD's determination that a decontamination procedure was appropriate. (Dunlap Aff. ¶ 9). Although Johnson knew that there was no visible powder, the lack of an observable substance did not mean that there was no hazardous substance on the letter. (Johnson Dep. at 86). She was still concerned that there might be something on the envelope that they could not see which caused the detainees' reaction. (Johnson Dep. at 83).

About an hour to an hour and a half after Putman entered Room 110, Johnson called and informed her that all of the people in Room 110 were going to be decontaminated. Johnson explained the process and explained the concerns about the individual who sent the letter. (Putman Dep. at 24-26). Putman told Johnson there were 9 people in Room 110, including Putman. There is no indication that Johnson knew the occupants of Room 110 were all women. (Putman Dep. at 26).

Wyman appointed William Drury of the ELFD to be in charge of the decontamination. (Drury Dep. at 14). Drury went into the building with other firefighters and with Bob Ceru of ORCBS. Drury bounced ideas off of Ceru and discussed how and where to set up the decontamination line. (Drury Dep. at 14).

5

Approximately one and a half hours after Conlin's initial call, DPPS Lt. Johnson, directed DPPS Officer Steven Beard and ORCBS Officer Peter Grivins to put on hazmat suits and to go into Room 110 to recover evidence for analysis, to learn what they could from the letter, to package and remove the letter and envelope, to evaluate hazardous cleanup requirements, and to assist in escorting detainees to the decontamination pools. (Johnson Dep. at 41; Beard Dep. at 18; Grivins Dep. at 17). It took Beard and Grivins about 40 minutes to put on the hazmat suits. (Grivins Dep. at 20-21).

Beard and Grivins did not enter Room 110 until after the decontamination line had been set up. (Beard Dep. at 14 & 20). Room 110 was a suite of offices. (Grivins Dep. at 17-18). Beard went into the mail sorting area at the back of Room 110 and extracted the letter from the envelope to look for signs of tampering, chemical stains, or residue. (Beard Dep. at 24; Grivins Dep. at 34). Beard put the letter and envelope in plastic bags and sent them through the decontamination line. The letter and envelope were given to the FBI for processing. (Beard Dep. at 29-30; Ceru Dep. at 34).

Captain Mark Galat of the ELFD, the safety officer for the decontamination, had authority to call off the procedure. (Wyman Dep. at 37, 40-41). When he learned from Beard that there was no white powder, he discussed cancelling the procedure with Wyman. (Wyman Dep. at 41-44). By this time Wyman had information about the sender of the letter, which added to the credibility of the threat, so he told Galat he thought they had to continue with the decontamination. (Wyman Dep. at 42-44).

While Grivins and Beard were in Room 110 one of the detainees expressed concern for the occupants of Room 116 because they shared a mail room and they needed help, too. (Grivins Dep. at 36-37, 73). Grivins relayed this information to Lt. Johnson. (Grivins Dep. at 37). The occupants of Rooms 110, 116 and 118 are all involved in the administration of the graduate school so there is interaction among the people in those three offices. (Allison Dep. at 39). Moreover, the letter was in Room 118 for at least one day before Conlin opened it.

Susan Pavick and Evette Chavez were two of the people in Room 116. Pavick mentioned to Chavez that she was experiencing some tingling in her lips, fingers and toes. (Pavick Dep. at 9-12). Chavez also may have said something about an irritation in her throat. (Pavick Dep. at 11). Later, at the hospital, Chavez stated that she had experienced a burning in her mouth, lips and throat. (DPPS Det. Martin Report, Def. Ex. 14). The decision was made to detain and decontaminate the occupants of Rooms 116 and 118 as well. Because the decision to detain the occupants of these rooms was made so late, there had already been some coming and going of the occupants of these rooms. There is evidence that David Lektzian and Sara Washington who had offices in the basement, came up to Room 116 to find out what was going on, and then left the building. This was prior to the arrival of the decontamination people. (Allison Dep. at 38-39; Pavick Dep. at 45, 47).

Grivins and Beard informed the occupants of Room 116 that they would have to be decontaminated. This came as a surprise to them and they were resistant to the process.

7

(Grivins Dep. at 49).   Beard does not recall any objection to the decontamination procedure from the individuals in Room 110, but acknowledges that there was resistance from individuals in the second room.  (Beard Dep. at 42).  Beard told the detainees that they would be arrested if they did not cooperate.  (Grivins Dep. at 71; Pavick Dep. at 14, 55-56).  Beard yelled at Chavez, grabbed her, and threatened to arrest her if she did not comply with the decontamination procedure.  (Chavez Dep. at 50).

Grivins and Beard escorted the detainees to the decontamination line.  (Beard Dep. at 40).  Several of the detainees requested a woman to conduct the decontamination, but their requests were either ignored or denied because there were no women available.  (Pavick Dep. at 14; Chavez Dep. at 53).  Chavez spoke to ORCBS employee Jean Chisnell who had been assigned to secure the perimeter of the building, and Chisnell told her that she was trained to do the decontamination.  (Pavick Dep. at 14, 44).[1]  Chisnell spoke with Parmer regarding Chavez's request that she participate in the decontamination procedure, but Parmer rejected the idea because the decontamination personnel had dressed-out and the procedure was already underway.  (Chisnell Aff . ¶¶ 3-4).

The decontamination procedure was set up in the hallway.  It consisted of three small pools.  The women were required to strip and step into each pool where they had the bleach

---

[1]After the incident Chisnell indicated that she has a respiratory condition and health considerations that preclude her from training to work with the use of a self-contained breathing apparatus.  (Chisnell Aff. ¶ 5).  For purposes of this motion the Court will assume that Chisnell was physically able to assist with the decontamination.

solution sprayed on them and some of them were physically scrubbed by hand or by a toilet-bowl type brush on their breasts and other private areas.  (Conlin Dep. at 92; Granger Dep. at 45-46; Chavez Dep. at 53).  All of the officers who performed the decontamination procedure were male.  No protective tents were set up around the pools.  The windows on the front east doors were covered, but the windows on the glass doors on the west were not covered.  (Conlin Dep. at 45; Putman Dep. at 48; Pavick Dep. at 51; Allison Dep. at 29).  Some of the officers were rude and made inappropriate or sexually suggestive comments.  (Allison Dep. at 30; Granger Dep. at 31).  Men who were not in protective clothing and who were not in uniform were milling around the hallways and were able to view the decontamination procedure.  (Conlin Dep. at 44-45; Chavez Dep. at 50; Allison Dep. at 26-27; Del Rio Dep. at 27).  Occupants of the second floor were also able to look down the staircase toward the hallway where the decontamination procedure was conducted.  (Grivins Dep. at 48-49, 72; Pavick Dep. at 16-17).  Following the decontamination procedure at the university, Plaintiffs were taken by ambulance to Sparrow Hospital where they went through a second decontamination procedure.

The letter at issue was a Freedom of Information Act request.  It was tested by the FBI, by the Michigan State Police Crime Lab, and by Dr. Bolin, MSU Professor of Bacteriology, and all of the tests came back negative.  (Johnson Dep. at 83-85).

## II.

Because the procedural history of this case is somewhat convoluted it will be recounted here.

Seven of the fifteen detainees filed this action against MSU, MSU President Peter McPherson, DPPS Deputy Chief James H. Dunlap, DPPS Lt. Mary Johnson, ORCBS Director John Parmer, the City of East Lansing, the ELFD, and Fire Chief Randy Talifarro, alleging constitutional violations, state tort claims, and gender discrimination under the Elliot-Larsen Civil Rights Act. On June 2, 2004, in response to the University Defendants' motion to dismiss, this Court dismissed Plaintiffs' 1983 claim for damages against the University Defendants, Plaintiffs' tort claims against MSU, Plaintiff's Elliot-Larsen public accommodation claim, and Plaintiffs' Elliot-Larsen gender discrimination claim against the individual University Defendants but not the university itself.[2] The Court granted Plaintiffs leave to amend to address inadequacies in their procedural due process claim. On June 17, 2004, Plaintiffs filed an amended complaint adding defendants Beard and Williams. (Docket # 26). That complaint was stricken because Plaintiffs had not obtained leave to add

---

[2]Dismissal of the Elliot-Larsen claims against the individual defendants was premised on *Jager v. Nationwide Truck Brokers, Inc.*, 252 Mich. App. 464, 652 N.W.2d 503 (2002), which held that the Elliot-Larsen Civil Rights Act "provides solely for employer liability, and a supervisor engaging in activity prohibited by the CRA may not be held individually liable for violating a plaintiff's civil rights." *Id.* at 485. Subsequent to dismissal of Plaintiff's Elliot-Larsen claims against the individual University Defendants the Michigan Supreme Court explicitly overruled *Jager* and held that liability under the Elliot-Larsen Civil Rights Act extends to individual agents of the employer. *Elezovic v. Ford Motor Co.*, 472 Mich. 406, 426, 697 N.W.2d 851 (2005).

additional defendants. (Docket # 27). Plaintiffs filed an amended complaint on June 25, 2004. (Docket # 28). On January 24, 2005, this Court granted the Defendants' motion to dismiss the procedural due process claim. (Docket # 46).

On May 31, 2005, Plaintiffs filed a motion to amend their complaint to add six additional defendants: Wyman, Williams, Drury, Montgomery, Beard and Ceru. The motion was denied by Magistrate Judge Scoville on June 22, 2005, after a hearing. (Docket # 79).

On July 22, 2005, pursuant to the parties' stipulation, this Court entered an order dismissing with prejudice Plaintiffs' claims against the ELFD and Randy Talifarro, Plaintiffs' § 1983 claim against Defendant McPherson, Plaintiffs' false imprisonment and intentional infliction of emotional distress claims in Counts II and V against Defendants McPherson and Dunlap, and Plaintiffs' assault and battery claims in Counts III and IV against all Defendants. (Docket # 86).

In light of the Court's orders of partial dismissal, Plaintiffs' complaint now contains the following counts:

1. 42 U.S.C. § 1983 claim (unreasonable search and seizure, substantive due process, and right to privacy) for injunctive relief against the University Defendants and for both damages and injunctive relief against the City of East Lansing.

2. False imprisonment claim against Johnson, Parmer, and the City of East Lansing.

5. Intentional infliction of emotional distress claim against Johnson, Parmer, and the City of East Lansing.

11

      6.      Elliot Larsen Civil Rights Act gender discrimination claim against the University and the City of East Lansing.

This matter is currently before the Court on motions for summary judgment filed by the City of East Lansing and the University Defendants.[3]  (Docket #'s 53 & 59).

## III.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If Defendants carry their burden of showing there is an absence of evidence to support a claim then Plaintiffs must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

"On summary judgment, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the parties opposing the motion."  *Hanover Ins. Co. v. American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994) (citing *Matsushita*, 475 U.S. at 586-88). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiffs' position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477

---

[3]The motion for summary judgment filed by Fire Chief Talifarro (Docket # 51) has been rendered moot by the order dismissing him with prejudice from this case.

U.S. 242, 252 (1986).  The proper inquiry is whether the evidence is such that a reasonable

jury could return a verdict for Plaintiffs.  *Id.  See generally, Street v. J.C. Bradford & Co.*, 886

F.2d 1472, 1476-80 (6th Cir. 1989).

### IV.

Count I of Plaintiffs' complaint is a § 1983 claim alleging violations of Plaintiffs'

constitutional rights to privacy, substantive due process, and the right to be free from

unreasonable searches and seizures as a result of Plaintiffs' detention and decontamination.

Although Plaintiffs contend that they should be allowed to proceed on multiple

constitutional theories, it is well settled that "[w]here a particular Amendment 'provides an

explicit textual source of constitutional protection' against a particular sort of government

behavior, 'that Amendment, not the more generalized notion of "substantive due process,"

must be the guide for analyzing' such a claim."  *Albright v. Oliver*, 510 U.S. 266, 273 (1994)

(quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

The gravamen of Plaintiffs' substantive due process and privacy claims focus on their

detention and the exposure of their bodies during the decontamination procedure.  The Fourth

Amendment preserves the right of citizens "to be secure in their persons . . . against

unreasonable searches and seizures."  U.S. Const. Amend. IV.  Allegations of unreasonable

detention clearly come within the explicit "unreasonable seizures" language of the Fourth

Amendment.  Plaintiffs' privacy claims are also best analyzed under the Fourth Amendment's

guarantee of security in one's person against "unreasonable searches."  Although some cases

from other circuits have found protection in the liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment, the Sixth Circuit has noted that it has found the privacy right against forced exposure of one's body to strangers of the opposite sex to be located in the Fourth Amendment. *Everson v. Michigan Dept. of Corrections*, 391 F.3d 737, 757 n.26 (6th Cir. 2004) (citing *Cornwell v. Dahlberg*, 963 F.2d 912, 196 (6th Cir. 1992); *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987)).

Because the focus of this case is on the use of police powers in an emergency setting, the Fourth Amendment provides the most appropriate framework for analyzing Plaintiffs' constitutional claims, and Plaintiffs' substantive due process and privacy claims are subsumed within the more particularized protections of the Fourth Amendment.

Plaintiffs' allegations against the Defendants can be broken down into the decision to detain, the decision to decontaminate, and the execution of the decontamination procedure. The undisputed evidence reveals that the University Defendants were responsible for the decision to detain, that the decision to decontaminate was a joint decision made by the University Defendants and the ELFD, and that the ELFD was responsible for executing the decontamination procedure.

## A.  Individual University Defendants

The individual University Defendants move for summary judgment on Plaintiffs' § 1983 Fourth Amendment claim on the basis of qualified immunity.

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining whether a defendant is entitled to qualified immunity, the Sixth Circuit employs a three-step inquiry:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900-01 (6th Cir. 2004) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).  Qualified immunity protects the officials from liability unless the answer to all three questions is "yes."  *Id.* at 901.

### 1.  Violation of the Fourth Amendment

The individual University Defendants do not deny that Plaintiffs were detained or seized within the meaning of the Fourth Amendment.  They contend, however, that there was no Fourth Amendment violation based upon the exigent circumstances exception to the warrant requirement.  One of the situations that can give rise to exigent circumstances is "a risk of danger to the police or others." *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (citing *Minnesota v. Olson*, 495 U.S. 91 (1990)).  The "risk of danger" exigency, also

known as the emergency aid doctrine, is most frequently cited in cases where the government is acting in something other than a traditional law enforcement capacity. *United States v. Rohrig*, 98 F.3d 1506, 1516 (6th Cir. 1996).

Of course, the emergency must be real.  The emergency aid doctrine cannot be used to justify a warrantless search or seizure if the emergency is created by the government officials. *See United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984) ("Police officials, however, are not free to create exigent circumstances to justify their warrantless intrusions."); *United States v. Buchanan*, 904 F.2d 349, 355 (6th Cir. 1990) (officers cannot rely on exigency they created).

Plaintiffs contend that there was no real emergency other than the one created by Defendants' own gross negligence and failure to assess the facts before acting.  The evidence reveals, however, that Defendants responded to the following evidence:   there was a suspicious looking letter that had been resealed; the person who opened the letter immediately felt a burning sensation in her throat; the letter was from an individual associated with an animal rights activist group; the sender was a pharmacist with access to chemical contaminants; the FBI had concerns about and was watching the sender; additional individuals also reported burning in their throats; the hospital required decontamination as a prerequisite to admission; this occurred shortly after September 11,  2001, during the wave of national anthrax related incidents; and this occurred against the background of a history of animal

rights violence at MSU.  Based upon this undisputed evidence, Defendants had reason to believe that they were faced with a biological or chemical hazard emergency.

Plaintiffs point out that Conlin made the call on a non-emergency line, that she advised that she did not need medical attention, and that there was no white powder.  Conlin, however, was not trained to evaluate or responsible for determining whether she or others were facing an emergency situation.  The lack of white powder, which was known to Defendants early on, does not undermine the reasonableness of their response to the situation because not all biological or chemical threats involve white powder.  Neither do they all involve the same sequence or rate of symptoms.  The fact that the letter turned out to be an FOIA request, rather than a direct a threat was not known at the time the Defendants made the decision to detain and decontaminate.

Plaintiffs' factual references are not sufficient to show that Defendants' response to the letter was unreasonable given what they knew.  The fact that some aspects of their response might be construed as sloppy or uncoordinated, does not mean that it was unreasonable for Defendants to treat the situation as an emergency. The uncontested facts reveal that the University Defendants had probable cause to believe there was a biological emergency that required a decontamination response to protect the employees and others from an unknown biological or chemical threat.  Accordingly, the facts do not support Plaintiffs' claims of a Fourth Amendment violation by University Defendants.

17

## 2.  Violation of Clearly Established Law

The individual University Defendants are also entitled to qualified immunity because the law on detention and decontamination procedures in the face of a biological hazard was not clearly established at the time.

Plaintiffs correctly assert that the law was clearly established that they had a privacy interest in shielding their naked bodies from view by others, especially members of the opposite gender.  *See*, *e.g.*, *Everson v. Mich. Dep't of Corrections*, 391 F.3d 737, 757 (6th Cir. 2004) ("Our court has recognized that 'a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners.'"); *Rose v. Saginaw County*, 353 F. Supp.2d 900, 919-20 (E.D. Mich. 2005) (discussing prisoners).

However, for a constitutional right to be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991).  "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ. of Harlan County, Ky.* 118 F.3d 507, 515-16 (6th Cir. 1997) (quoting *Lassiter v. Alabama A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)).  Although it need not be the case

18

that the very action in question has been previously held unlawful, the unlawfulness must be apparent in the light of pre-existing law. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)). In determining whether a right is clearly established, the court looks first to decisions of the Supreme Court, then to decisions of the circuit and other courts within the circuit, and finally to decisions of other circuits. *Beard v. Whitmore Lake School Dist.*, 402 F.3d 598, 606-07 (6th Cir. 2005) (citing *McBride v. Village of Michiana*, 100 F.3d 457, 460 (6th Cir. 1996)). An action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs. *Feathers*, 319 F.3d at 848 (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2516-17 (2002)).

In *Beard*, after money was found missing, the school directed that a number of boys and girls be searched by a teacher of their same gender. The search involved pulling down their pants and pulling up their shirts. The Sixth Circuit held that this highly intrusive search that was conducted without individualized suspicion, and was conducted to find missing money and not for weighty purposes, was unconstitutional. 402 F.3d at 606. Nevertheless, the court held that the law involving strip searches of students did not clearly establish that these searches were unreasonable. *Id.*

Plaintiffs contend that *Beard* is not controlling because unlike the students in *Beard* Plaintiffs were required to remove all of their clothing and they were viewed by members of the opposite sex. According to Plaintiffs, if the *Beard* court were confronted with the facts

19

in this case, it would have found that the Defendants' actions violated clearly established constitutional rights. Plaintiffs cite to cases which have held that forced exposure of one's naked body to strangers of the opposite sex is unreasonable. *See e.g.*, *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987) (allowing female guards to view naked male prisoners without restriction was a violation of prisoners' right to privacy); *Cornwell v. Dahlberg*, 963 F.2d 912, 196 (6th Cir. 1992) (same). However, Plaintiffs have cited no prior case law on the proper procedures to employ for detention and decontamination in an emergency situation related to a biological or chemical threat. The cases Plaintiffs cite do not address such factors as the apparent emergency situation, the ability of air-borne contaminants to get under clothing, or the time constraints that might have militated against finding qualified women to run the decontamination procedure.

Plaintiffs have not shown that the officers violated clearly established law.

### 3. Objectively Unreasonable

Finally, the individual University Defendants are also entitled to qualified immunity because their response to a perceived threat was not objectively unreasonable in light of clearly established law.

Plaintiffs contend that Defendants' response was simultaneously cautious and careless, and that this inconsistency creates an issue of fact as to whether Defendants reasonably believed there was an emergency that required a decontamination response or whether they were merely using the occasion as an opportunity to test their emergency response at the

Plaintiffs' expense.  In support of this assertion Plaintiffs note that not everyone who was exposed was detained; that the building was not completely sealed; that not all of the responders were in protective gear; that Beard opened the letter in the presence of the Plaintiffs without regard for their safety; and that the decontamination procedure was abbreviated for the last detainees because the people in hazmat suits were running out of oxygen.

Although there is evidence that the detention and decontamination procedure was not as smooth or as comprehensive as it might have been, many of the inconsistencies in Defendants' response are attributable to the fact that the methodology for responding to this kind of emergency was still in the developmental stage and the facts regarding who had been exposed and the nature of the threat were unfolding even as Defendants were initiating their response.  Most importantly, however, there is no evidence to suggest that Defendants were not taking the situation seriously.  In light of the potentially grave risks associated with biological or chemical contamination, the University Defendants' response of detaining the Plaintiffs and calling in the ELFD to perform a decontamination procedure cannot be deemed objectively unreasonable.

The Court concludes that the University Defendants are entitled to qualified immunity and accordingly to summary judgment on Plaintiffs' Fourth Amendment Claim.

21

**B.  Michigan State University**

Plaintiffs' only remaining claim against the University is a claim for prospective injunctive relief.  Because this Court has already determined in the analysis above that the facts are not sufficient to show that the individual University Defendants violated the Plaintiffs' Fourth Amendment rights, Plaintiffs have failed to establish an "ongoing violation of federal law" that would entitle them to prospective injunctive relief.  *See Westside Mothers v. Haveman*, 289 F.3d 852, 861 (6th Cir. 2002).  Furthermore, the University has presented evidence that subsequent to the events giving rise to this case it has implemented systemic improvements for handling such emergency situations, including improvements in the areas of rapid assessment, communications, medical advice, privacy and post-event counseling services.  (Aff. of Lou Anna K. Simon ¶ 3).  Although Plaintiffs contend that the possibility of repeating these events is not "remote," they have not produced any evidence that the new policy does not address the concerns raised in their case.  In light of the University's amended emergency response procedures the Court finds no basis for the extraordinary measure of enjoining the University to do what it has already done.

**C.  City of East Lansing**

The City of East Lansing contends that it is entitled to summary judgment on Plaintiffs' Fourth Amendment claim because Plaintiffs cannot prove that a custom, policy or practice of the City of East Lansing was the moving force behind the alleged violations of constitutional rights.

A municipality cannot be held liable under § 1983 under a theory of *respondeat superior* for the actions of an employee. *Monell v. Dept. of Soc. Servs. of New York City*, 436 U.S. 658, 691 (1978). For a municipality to be liable under § 1983, the local government's policy or custom must be the "moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326 (1982) (quoting *Monell*, 436 U.S. at 694). "[T]he inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (quoting *City of Canton*, 489 U.S. at 389).

The Sixth Circuit has recognized two situations in which inadequate training could be found to be the result of deliberate indifference: 1) "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction," and 2) failure "to act in response to repeated complaints of constitutional violations by its officers." *Cherrington*, 344 F.3d at 646 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).

Plaintiffs contend that the City is liable under § 1983 because its failure to train its employees resulted in a policy of deliberate indifference to Plaintiffs' constitutional rights. Specifically, Plaintiffs allege a failure to train in the following areas:

23

1.      how to conduct a decontamination procedure;

2.      appropriate privacy measures to be taken during a decontamination procedure;

3.      how to make a medical assessment of an emergency situation before administering a highly intrusive decontamination procedure;

4.      how to stop a decontamination procedure when it is no longer necessary.

Defendant City has produced unrebutted evidence that it had a decontamination procedure in place that conformed with State law requirements.  The City has also produced evidence that the ELFD officers on site had the authority to stop the decontamination procedure, that they considered that option, but that they declined to stop the procedure in light of the information they received regarding the sender of the letter and the additional individuals who were reporting throat irritation.

Although the ELFD's decontamination policy addressed the need for privacy, the evidence of how the procedure was actually conducted is sufficient to raise an issue of fact for trial as to whether the privacy training received by the ELFD was adequate.   Because there is no evidence of prior complaints of privacy violations by the ELFD that would put the City on notice that its officers needed additional training in decontamination procedures, the focus of this Court's analysis must be on whether the City provided adequate training in light of foreseeable consequences that could result from the lack of instruction.

A wet decontamination procedure requires detainees to take off their clothes and to be washed off.  Such a procedure necessarily implicates privacy issues.  Because privacy

24

concerns are foreseeable, a reasonable jury could find that an agency that undertakes responsibility for conducting wet decontaminations must train its employees on how to address privacy concerns and that the failure to provide adequate privacy training amounts to deliberate indifference.

There is also evidence in this case from which a jury could find that the privacy training was inadequate.  There is evidence that all of the detainees were women, that little effort was made to address the detainees' concern for having a female decontamination officer, that windows from the outside were not covered, that males who were not involved in the decontamination procedure were milling around the decontamination area, that there were no privacy curtains around the decontamination pools, and that some of the detainees were treated in a sexually derogatory manner.  These facts are sufficient to create an issue for trial on the adequacy of the training provided by the City of East Lansing to its Fire Department employees who were assigned to carry out this procedure.

## V.

In Counts II and V Plaintiffs allege state law false imprisonment and intentional infliction of emotional distress claims against Defendants Johnson, Parmer, and the City of East Lansing.

### A.  State Law Tort Claims Against MSU Defendants

Plaintiffs contend there are questions of fact as to whether University Defendants Parmer and Johnson falsely imprisoned them and inflicted emotional distress on them based

on Johnson's issuance of the order to detain them and to have them undergo a wet decontamination procedure and on Parmer's failure to prevent the detention and his participation in setting up the decontamination procedure.

The elements of a false imprisonment claim are "[1] an act committed with the intention of confining another, [2] the act directly or indirectly results in such confinement, and [3] the person confined is conscious of his confinement." *Moore v. City of Detroit*, 252 Mich. App. 384, 387, 652 N.W.2d 688, 691 (2002) (quoting *Adams v. National Bank of Detroit*, 444 Mich. 329, 341, 508 N.W.2d 464 (1993)). "The essence of a claim of false imprisonment is that the imprisonment is false, i.e., without right or authority to do so." *Id.* at 388, (quoting *Hess v. Wolverine Lake*, 32 Mich. App. 601, 604, 189 N.W.2d 42 (1971)).

As discussed above in connection with Plaintiffs' § 1983 claim, their detention by the University Defendants was not wrongful or without right or authority to do so. Accordingly, the University Defendants are entitled to summary judgment on Plaintiffs' false imprisonment claim.

When a court sits in diversity, it must apply state law in accordance with the controlling decisions of the highest court of the state. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). "If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue." *Id.*

26

Although the Michigan Supreme Court has not formally recognized the tort of intentional infliction of emotional distress, in recent years the tort has repeatedly been recognized by the Michigan Court of Appeals. *See*, *e.g.*, *Heckmann v. Detroit Chief of Police*, — Mich. App. —, — N.W. 2d — , 2005 WL 1752825 (Jul. 26, 2005); *Lewis v. LeGrow*, 258 Mich. App. 175, 196, 670 N.W.2d 675 (2003); *Nelson v. Ho*, 222 Mich. App. 74, 85 n 6; 564 N.W.2d 482 (1997); *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594; 374 N.W.2d 905 (1985). This Court cannot say that the Michigan Supreme Court would not recognize such a tort in the future.  Accordingly, the Court will consider this claim.

In order to establish intentional or reckless infliction of emotional distress, a plaintiff must show

> (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. A defendant is not liable for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Heckmann*, at *--- (quoting *Lewis*, 258 Mich. App at 196).

As noted above, Defendants had reason to believe that the letter presented a biological or chemical emergency.  The detention and decontamination of the Plaintiffs was a legitimate response to a perceived emergency.  There is nothing extreme or outrageous about detaining individuals for decontamination when there is reason to believe they have been exposed to hazardous materials.  Thus, Johnson and Parmer are entitled to summary judgment on

Plaintiffs' claim of false arrest.  In addition, to the extent Plaintiffs' base their intentional infliction of emotional distress claim on the conduct of DPPS Officer Beard, Beard is not a Defendant and there is nothing in the record to suggest that either Johnson or Parmer should be held liable for any of his actions.

**B.  State Tort Claims Against City of East Lansing**

With respect to the state law tort claims against the City, the City contends that it is entitled to statutory governmental immunity:  "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function."  M.C.L. § 691.1407.

Plaintiffs do not deny that the City was engaged in a governmental function.  Instead, Plaintiffs contend that their claim against the City falls within the governmental immunity exception for medical care: "This act does not grant immunity to a governmental agency or an employee or agent of a government agency with respect to providing medical care or treatment to a patient . . . " M.C.L. § 691.1407(4).

Plaintiffs' attempt to expand the reach of the medical care exception to the facts of this case stretches the exception beyond its intended scope.  Defendants were providing protection to the public, not medical care to the detainees.  The City of East Lansing is entitled to statutory governmental immunity for its execution of the decontamination procedure because it was engaged in the exercise or discharge of a governmental function.

28

## VI.

In Count VI Plaintiffs allege that the University violated the Elliot Larsen Civil Rights Act by subjecting its employees to a hostile work environment by detaining them and subjecting them to a decontamination procedure.   The elements of the hostile work environment claim are:

(1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5) respondeat superior.

*Jager v. Nationwide Truck Brokers, Inc.*, 252 Mich. App. 464, 472-73, 652 N.W.2d 503, 509 (2002).

In support of their sex discrimination claim Plaintiffs note that all of the detainees were women, and all of the decontaminators were men, even though there was a qualified female decontaminator on the scene.   Plaintiffs also note that a male graduate student, David Lektzian, was allowed to leave Linton Hall.  (Pavick Dep. at 45).

When Johnson issued the order to detain the occupants of Room 110, there is no evidence that she was aware that the occupants were all women.  Although there is evidence

29

that a male, David Lektzian, was allowed to leave Linton Hall, the evidence reveals that a woman was allowed to leave with him.  The two individuals who were allowed to leave the building had offices in the basement, not in Rooms 110, 116, or 118.  They were not similarly situated to the women who were detained.  There is simply no evidence to support an inference that the individuals in Rooms 110, 116 and 118 were treated differently and were subjected to the decontamination procedure because they were women.

To the extent Plaintiffs contend that the execution of the decontamination procedure subjected them to sexual harassment because it was performed by men rather than by women, that procedure was the responsibility of the City and is not a basis for finding liability on behalf of the University.

In light of this Court's determination that there is insufficient evidence to support Plaintiffs' Elliot-Larsen gender discrimination claim, this Court need not reinstate Plaintiffs' Elliot-Larsen Civil Rights claims against the individual University Defendants.[4]

## VII.

There is no question that the events of October 12, 2001, subjected the Plaintiffs to an experience that for many of them was humiliating and degrading.  Nevertheless, the undisputed facts reveal that the University had reason to believe that there was a true emergency that required a decontamination response.  The University Defendants are entitled to summary judgment for their role in detaining the Plaintiffs and requiring them to undergo

---

[4]*See* footnote 2.

the decontamination procedure.  The City of East Lansing is entitled to summary judgment on all claims except Plaintiffs' claim that the ELFD failed to adequately train its employees on privacy issues associated with wet decontamination procedures.  That is the sole issue remaining for trial.

An order and partial judgment consistent with this opinion will be entered.


Date:    August 31, 2005          /s/ Robert Holmes Bell
                                  ROBERT HOLMES BELL
                                  CHIEF UNITED STATES DISTRICT JUDGE